UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| THOMAS M. KUCZYNSKI,<br>*Plaintiff*, | 3:19-CV-226 (KAD) |
| v. | |
| VIAD CORP,<br>*Defendant.* | November 21, 2019 |

MEMORANDUM OF DECISION RE:
APPLICATION TO VACATE ARBITRATION AWARD (ECF NO. 1-1)

Kari A. Dooley, United States District Judge:

This matter follows the arbitration of an employment dispute between Plaintiff Thomas M. Kuczynski ("Kuczynski") and his former employer, Defendant Viad Corp ("Viad"). Kuczynski filed the instant Application to Vacate Arbitration Award ("the Application") in Connecticut Superior Court on January 22, 2019, seeking vacatur of an award entered against him and in favor of Viad on December 20, 2018. (App., ECF No. 1–1.) Viad removed the action to this Court on February 15, 2019 (ECF No. 1) and filed an opposition to the Application on February 22, 2019. (ECF No. 12.) Kuczynski filed a reply brief on March 6, 2019. (ECF No. 15.) The Court has considered the parties' submissions. For the reasons set forth below, the Application to Vacate is DENIED.

**Background**

    **The Parties and Factual Basis for Kuczynski's Claims**

Viad is a corporation engaged in the business of providing services for live events and travel and recreational activities. (Stipulation of Uncontested Facts ¶ 2, Notice of Removal Ex. C, hereafter, "Stip.," ECF No. 1-3). It hired Kuczynski in 2008 to serve as its Chief Corporate

Development and Strategy Officer. (*Id.* ¶ 4.) Pursuant to its Omnibus Incentive Plan, Viad granted Kuczynski long-term incentive awards that included Restricted Stock awards ("RSAs") and Performance Units ("PUs"). (*Id.* ¶ 5.) These awards were governed by individual RSA and PU agreements, each of which contemplated a three-year vesting cycle—that is, there was a three-year restriction or performance period, after which the awards would fully vest. (*See* Award Agreements, Def.'s Opp. Ex. 4 ¶ 2, ECF No. 12-5 at 2, 8, 15, 21.) Kuczynski's compensation package also included a cash bonus referred to as a Management Incentive Plan ("MIP"). (App. at 8; Stip. ¶ 7.)

Viad terminated Kuczynski's employment in March 2016 and in April 2016 the parties executed a Severance Agreement and General Release (the "Severance Agreement," or the "Agreement"). (Stip. ¶¶ 6, 8.) It is undisputed that Kuczynski was not terminated for cause. (*See* Final Award at 4, App. Ex 1, ECF No. 1-1 at 24.) The Severance Agreement set forth the compensation and benefits to which Kuczynski was entitled following his separation, which included "a pro-rated payment pursuant to Employer's 2016 [MIP], if earned, subject to the MIP terms and conditions . . . ." (Agreement, App. Ex. 2 ¶ 2A.i., ECF No. 1-1 at 29–30.) Viad compensated Kuczynski for his prorated 2016 MIP and Kuczynski does not dispute that such proration was appropriate under the Severance Agreement. (Stip. ¶ 11.)

As of Kuczynski's termination, Viad had granted him long-term incentive awards comprised of 2,800 RSAs (2014); 2,200 RSAs (2015); 6,500 PUs (2014); and 5,200 PUs (2015). (Stip. ¶ 7.) Following his termination, Viad paid Kuczynski for 1,857 RSAs (2014); 787 RSAs (2015); 4,821 PUs (2014); and 2,123 PUs (2015). (*Id.* ¶¶ 12–13.) Kuczynski does not disagree with the price per unit he was paid. Rather, he maintains that he was entitled to payment for all RSAs and PUs he had been awarded by the date of his termination—including a 2016 RSA of

2,300 shares that was completely forfeited—and asserts that Viad was not authorized to pro rate or reduce the number of units in any manner. (*See id* ¶¶ 7, 13*; see also* App. at 9–10.)

Pursuant to the Agreement's arbitration clause, (*see* Agreement ¶ 20), Kuczynski filed claims for Breach of Contract, Breach of the Covenant of Good Faith and Fair Dealing, and Violation of Connecticut's Wage Statute with the American Arbitration Association in February 2018. (*See* Arbitration Compl., App. Ex 3, ECF No. 1-1 at 38.) A hearing was held on October 29, 2018, during which both Kuczynski and Viad's assistant general counsel testified. (*See* Final Award at 3.) Following the filing of post-hearing briefs and reply briefs and the closing of the record, the arbitrator denied Kuczynski's claims on December 20, 2018.

**The Arbitration and Decision**

As discussed, the parties disagreed as to whether, under the terms of the Severance Agreement, Viad was required to pay Kuczynski for the outstanding RSAs and PUs that had not fully vested as of his termination instead of prorating the awards based on the length of his employment.

On this issue the Severance Agreement provided in pertinent part:

Employee's Restricted Stock Awards and Performance Units previously granted by Employer to Employee will continue to vest in accordance with the terms and conditions of the applicable agreement(s), including but not limited to Employee's requirement to execute this Agreement, which is being requested by Employer, and any diminution, forfeiture, or reduction in such awards due to Employee's termination of employment shall not apply, nor shall Employer utilize any discretion available under the Plan on its part which might result in a downward adjustment to the vesting or value of any award, except where the exercise of such discretion is with respect to the overall determination as to whether the financial Performance Measures have been achieved on a group basis and not in respect of an adjustment on an individual or selective basis for Employee.

(Agreement ¶ 2.C.) The Severance Agreement also contained a merger clause, which stated in relevant part that the "Agreement embodies the entire agreement of all the Parties hereto who have executed it and supersedes any and all other agreements, understandings, negotiations,

3

or discussions, either oral or in writing, express or implied, between the Parties," with certain categories of exceptions, including one for separate agreements regarding Restricted Stock, Performance Units, and other benefits, "which will remain in full force and effect." (*Id.* ¶ 13.)

The individual PU award agreements provided that in circumstances where the employee is terminated twelve or more months past the commencement date for reasons other than for cause, ownership of the units would vest at the end of the performance period on a pro rata basis based on the percentage of time that the employee was employed. (*See* Award Agreements ¶ 4(a), ECF No. 12-5 at 4, 17.) The RSA agreements similarly provided that in such circumstances, "full ownership of the Shares will occur to the extent not previously earned, upon lapse of the Restriction Period . . . and dividends will be paid through such period, in each case on a pro-rata basis, calculated based on the percentage of time such Employee was employed . . ." (*Id.*, ECF No. 12-5 at 10–11, 23–24.) The PU and RSA agreements further provided that no vesting would occur post-termination unless the employee executed a separation agreement and release in connection with his or her termination. (*See id.*)

Kuczynski asserted that "contrary to the express terms of the Severance Agreement, Viad has used its termination of Kuczynski as a basis for terminating payments and forfeiting awards, and has indicated an intent to continue to do so as additional awards become payable." (Arbitration Compl. ¶ 1.) Kuczynski claimed that the forfeiture and proration of his awards violated the unambiguous language of the Severance Agreement's terms "prohibiting diminution, forfeiture or reduction in such awards due to employee's 'termination of employment.'" (*See* Final Award at 3). Viad, on the other hand, maintained that this language only prevented the company from diminishing or reducing awards after they had already vested. (*See id*.)

Prior to the arbitration hearing, by decision dated June 20, 2018, the arbitrator determined "that the vesting language is unclear in the plan documents and the severance agreement." (Decision at 4, App. Ex. 5, ECF No. 1-1 at 74). At issue in that decision was "whether parol evidence should be the subject of discovery and hearing evidence in connection with interpreting the relevant language of the severance agreement and the plan documents." (*Id.* at 3.) In the Final Award, the arbitrator reiterated her finding when she observed that "[t]he Agreement is hardly a model of clarity and there is no one perfect interpretation that deals with all of the arguments raised by counsel." (Final Award at 5.) *See, e.g.*, *Stephens v. TES Franchising*, No. 301-cv-2267 (JBA), 2002 WL 1608281, at *3 (D. Conn. July 10, 2002) (observing that "the existence of two reasonable readings is the essence of ambiguity"). Thereafter, the arbitrator considered extrinsic evidence when assessing Kuczynski's claims and Viad's defenses.

The arbitrator first rejected Kuczynski's argument that the provision in paragraph 2.C of the Severance Agreement establishing that RSAs and PUs "previously granted by Employer to Employee *will continue to vest* in accordance with the terms and conditions of the applicable agreement(s)" (emphasis added) superseded the provisions of Viad's Omnibus Incentive Plan and the individual award agreements, all of which contemplated pro-rata vesting post-termination. (Final Award at 4–5.) The arbitrator further rejected Kuczynski's assertion that the second and third clauses of paragraph 2.C, which provide that "any diminution, reduction or forfeiture of such awards due to Employee's termination of employment shall not apply, nor shall Employee utilize any discretion available under the Plan on its part that might result in a downward adjustment in the vesting or value of any award," required that all of the RSAs and PUs fully vest. (*Id.* at 5–6.) Citing Kuczynski's hearing testimony and Viad's rejection of Kuczynski's effort to include specific language in the Severance Agreement that would have provided for full vesting without

proration, the arbitrator concluded that the interpretations that Kuczynski urged were untenable in light of the parties' negotiation history. The arbitrator accordingly denied Kuczynski's claims in their entirety.

**Standard of Review**

The Federal Arbitration Act ("FAA") establishes four grounds upon which a federal district court may vacate an arbitration award, including "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4).[1] A party is not entitled to relief under this provision merely because "the arbitrator committed an error—or even a serious error." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013) (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010)) (brackets omitted). To the contrary, "an arbitral decision even arguably construing or applying the contract must stand, regardless of a court's view of its (de)merits." *Id.* (quotation marks omitted). These proscriptions derive from the view "[t]hat limited judicial review . . . maintains arbitration's essential virtue of resolving disputes straightaway," as opposed to serving as "a prelude to a more cumbersome and time-consuming judicial review process." *Id.* at 568–69 (quoting *Hall Street Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 588 (2008) (alterations omitted)). The Supreme Court has thus cautioned that vacatur is only warranted under Section 10(a)(4) "when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice." *Stolt-Nielsen*, 559 U.S. at 671 (internal quotation marks and alterations omitted).

---

[1] The FAA governs contracts involving interstate or international commerce. *See Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005) (citing 9 U.S.C. §§ 1, 2). Because the Severance Agreement between Viad, a Delaware corporation headquartered in Arizona, and Kuczynski, a Connecticut resident, involves commerce (*see* Stip. ¶¶ 1–2), the Court will apply federal law to the question of whether Kuczynski has established grounds for vacatur. The standard for ordering vacatur of an arbitration award under Connecticut law, however, is substantively the same as that of the FAA. *See* Conn. Gen. Stat. § 52-418(a). Per the Severance Agreement, its interpretation is governed by Connecticut law. (Agreement ¶ 15.) These issues are not in dispute. (*See* App. at 3, 6; Def.'s Opp. at 12–13 n.1.)

Additionally, "the court may set aside an arbitration award if it was rendered in 'manifest disregard of the law.'" *Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 451 (2d Cir. 2011) (quoting *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 340 (2d Cir. 2010)). Vacatur may similarly be warranted "where the arbitrator's award is in manifest disregard of the terms of the [parties' relevant] agreement." *Id.* at 452 (quoting *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997)). As the Second Circuit noted recently, "it is somewhat unclear whether the 'manifest disregard' paradigm constitutes an independent framework for judicial review, . . . or a 'judicial gloss' on the FAA's enumerated grounds in section 10(a)," though either way it "remains a valid ground for vacating arbitration awards." *Weiss v. Sallie Mae, Inc.*, 939 F.3d 105, 109 (2d Cir. 2019) (internal quotation marks and citations omitted).

The party seeking vacatur bears the burden of proving that the arbitrator acted with manifest disregard of the law. *See T.Co Metals*, 592 F.3d at 339. The "standard of review under this judicially created doctrine is severely limited." *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 208 (2d Cir. 2002) (internal quotation marks omitted). "[A]wards are vacated on grounds of manifest disregard only in 'those exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent.'" *T.Co Metals*, 592 F.3d at 339 (quoting *Stolt-Nielsen SA v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 91–92 (2d Cir. 2008), *rev'd on other grounds*, 559 U.S. 662 (2010)) (alterations omitted). Such impropriety must rise to "more than error or misunderstanding with respect to the law." *Id.* (quotation marks omitted). Thus, a reviewing court may not vacate an arbitral award based on the court's disagreement with the arbitrator's interpretation of a contract; rather, "[i]f the arbitrator has provided even a barely colorable justification for his or her interpretation of the contract, the award must stand." *Schwartz*, 665 F.3d at 452 (quoting *Westerbeke*, 304 F.3d at 222).

7

**Discussion**

In the instant Application to vacate the arbitration award, Kuczynski asserts that by looking to the parties' negotiation history to ascertain the meaning of the Severance Agreement, the arbitrator ignored the parol evidence rule, which precludes consideration of extrinsic evidence to vary the unambiguous terms of a written contract, when, as here, it contains a merger clause. He asserts that this was in "manifest disregard of the law" on the use of parol evidence. He further asserts that under the unambiguous terms of the Severance Agreement, Viad was not permitted to pay his RSA and PU awards on a pro-rated basis.

Viad responds that an arbitrator's putative errors in interpreting a contract—including misapplication of the parol evidence rule—cannot satisfy the demanding "manifest disregard" standard, which countenances judicial vacatur of an arbitration award only in very limited circumstances. It thus argues that the standard for reviewing claims of manifest disregard precludes this Court from reaching the alleged interpretative flaws in the arbitrator's award as a matter of law. Alternatively, Viad argues that even if the Court were to review the arbitrator's decision in this regard, extrinsic evidence was properly considered given the Severance Agreement's ambiguities.

The threshold issue presented therefore is whether the arbitrator manifestly disregarded the law by looking to extrinsic evidence to ascertain the meaning of the Severance Agreement. The Court agrees with Viad that a reviewing court's disagreement on an issue of contractual interpretation, including the determination of whether a contract is ambiguous in the first instance, is generally not a ground for vacatur under the FAA. *See Schwartz*, 665 F.3d at 452 ("[I]nterpretation of the contract terms is within the province of the arbitrator and will not be overruled simply because we disagree with that interpretation") (quoting *Yusuf*, 126 F.3d at 25)

(alterations omitted); *T.Co Metals*, 592 F.3d at 339 ("[T]he award should be enforced, despite a court's disagreement with it on the merits, if there is a *barely colorable justification* for the outcome reached") (quoting *Wallace v. Buttar*, 378 F.3d 182, 190 (2d Cir. 2004)); *cf. Oxford Health*, 569 U.S. at 569 (explaining that "the sole question for" a reviewing court under FAA § 10(a)(4) "is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong"). Indeed, as the Second Circuit has observed, a court "obviously cannot substantively review the arbitrator's determination that key terms of the contract are 'clear and unambiguous'" as long as "the arbitrator was 'arguably construing or applying the contract.'" *New York Hosp. Med. Ctr. of Queens v. 1199 Nat'l Health & Human Servs. Employees Union*, 242 F.3d 366, 2000 WL 1786341, at *1 (2d Cir. 2000) (unpublished).

Here, it is evident that the arbitrator was aware of and applied the pertinent law on this issue. Kuczynski is correct that Connecticut law "adhere[s] to the general principle that the unambiguous terms of a written contract containing a merger clause may not be varied or contradicted by extrinsic evidence." *Alstom Power, Inc. v. Balcke-Durr, Inc.*, 269 Conn. 599, 610, 849 A.2d 804 (2004) (quoting *Tallmadge Bros, Inc. v. Iroquois Gas Transmission Sys., L.P.*, 252 Conn. 479, 503, 746 A.2d 1277 (2000)). He is also correct that any ambiguity identified must emanate from the contract language and not from one party's subjective interpretation. *See id.* at 610–11; *see also, e.g.*, *Lee v. BSB Greenwich Mortg. Ltd. P'ship*, 267 F.3d 172, 178–79 (2d Cir. 2001). The Court takes no issue with these well-settled principles of contract construction and interpretation. *See Westerbeke*, 304 F.3d at 209 (explaining that "the governing law alleged to have been ignored by the arbitrators" must have been "well defined, explicit, and clearly applicable") (quotation marks omitted).

But the arbitrator did not "ignore" these principles, as is required to identify a manifest disregard of the law. *See id.* at 217 ("The term 'disregard' implies that the arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it") (quotation marks and citation omitted). Indeed, in her pre-arbitration decision the arbitrator observed that Kuczynski, "[c]iting a number of cases, … argues convincingly that unless there is an ambiguity in the agreement, parol evidence is inadmissible to explain or contradict the written terms" of the Severance Agreement. (Decision at 3.) After acknowledging and applying this principle, she nonetheless concluded "that the vesting language is unclear in the plan documents and the severance agreement," thus warranting consideration of extrinsic evidence. (*Id.* at 4.) And as discussed above, this observation re-appeared in the Final Award. It simply cannot be maintained "that the arbitrator knew of the relevant principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it," as is required for a reviewing court to identify a manifest disregard of the law. *Westerbeke*, 304 F.3d at 217; *see also Stolt-Nielsen S.A.*, 559 U.S. at 672 n.3 (identifying this same standard and assuming *arguendo* it continues to apply despite some lack of clarity regarding the provenance of the manifest disregard doctrine). Rather, the arbitrator identified and applied the "clearly governing legal principle" to reach a conclusion with which Kuczynski disagrees. This is not a basis upon which the Court may order vacatur.

Kuczynski's other arguments go to the merits of the arbitrator's determination of ambiguity, the decision to permit extrinsic evidence, and the ultimate substantive contract interpretation.[2] As noted above however, it is not this Court's role in reviewing the arbitration

---

[2] For example, Kuczynski challenges the arbitrator's ruling by pointing out that Viad's only witness at the arbitration hearing admitted that Paragraph 2(c) of the Severance Agreement was not ambiguous. But Kuczynski identifies no controlling rule of law that the arbitrator chose to ignore that would have rendered

10

award to agree or disagree with the arbitrator, to substitute its own judgment for that of the arbitrator, or to subject the award to *de novo* review. Indeed, due deference precludes the Court from taking up these issues. *See Metso Minerals Canada, Inc. v. ArcelorMittal Exploitation Miniere Canada*, No. 19-cv-3379 (LAP), 2019 WL 5693731, at *5 (S.D.N.Y. Nov. 4, 2019) ("It is not the court's role to substitute its judgment for those of the arbitrators hired by the parties-- this is why the court's standard for vacatur is so very high") (quoting *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 392–93 (2d Cir. 2003)) (alterations omitted).

**Conclusion**

For the foregoing reasons, the Application to Vacate Arbitration Award is **DENIED.**

**SO ORDERED** at Bridgeport, Connecticut, this 21st day of November 2019.

*/s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE

---

a witness's or a party's perception of ambiguity—which is ultimately a legal question, *see, e.g.*, *Enviro Express, Inc. v. AIU Ins. Co.*, 279 Conn. 194, 200 (2006)—binding on the arbitrator. Rather, the putative errors identified by Kuczynski are fundamentally issues of contract interpretation, and it bears repeating that "disputes over contractual interpretation do not rise to the level of manifest disregard of the law." *Landmark Ventures, Inc. v. InSightec, Ltd.*, 63 F. Supp. 3d 343, 356 (S.D.N.Y. 2014), *aff'd*, 619 F. App'x 37 (2d Cir. 2015).